### PETER WRIGHT AND OTHERS vs. WILLIAM CORNELIUS.

1. A bill is filed by A. claiming to have purchased all the right of B. to a certain tract of land, sold under an execution in favor of A. and against B., and alleging that the land was entered in the name of C., with the money of B. Held, that B. is not a proper party to the bill: and that his declarations are not evidence against those claiming under C.

2. A mere allegation in a bill that B., with others, fraudulently conspired against A., does not authorize B. to be made a party to the bill, nor his declarations to be used as evidence against the others.

### APPEAL from Boone Circuit Court, (In Chancery.)

HAYDEN & ROBARDS, *for Appellant.*

The appellant will rely upon the following points to reverse the judgment of the Circuit Court:

1st. That the Court permitted the complainant to give to the Court, incompetent and irrelevant testimony.

2nd. The Court rendered the decree in the cause against law and evidence.

TODD & GORDON, *for Appellee.*

The complainant insists for the affirmance of the decree, upon the following points:

1. That the complainant had a right to give in evidence the oral and written statements of James M. Wright—for the purpose, 1st. Of disproving the facts as to him contained in his answer. 2nd. To prove fraud in him in the transaction as charged in the bill.

2. That circumstantial evidence is the best usually to be had to establish *fraud,* which seeks to cover the motives and acts,—the following facts are calculated to make it evident as existing in this case, and as tolerated by the intestate, and to bind his heirs. George M. Wright knew James had money—and gave advice to have this land entered with it, in some friend's name, to save it from creditors. It was entered in his name with James's agency—the fact of entry was subsequently known to George—he said he would enter it. Fletcher Wright was referred by George to James to purchase a part of the land—the residence and occupation of the land by James—the conversation between George and Kelly Wright, deposed to by J. K. Wright—and the fact of James borrowing George's money, giving note, disclosed, and corroborated by Elijah Wright—no evidence even since George's death of the existence of such note—no disavowal of James's ownership in George's life-time—no act of ownership by George—and all the facts corroborate the first written statement of James and his acts, to shew fraud.

3. The facts charged in the bill are not alleged to be within the knowledge of any of the defendants except James M. Wright—the evidence of one witness, or facts and circumstances equivalent to the evidence of one witness, is sufficient to sustain the decree against the answers of the defendants. 4 Bibb R. 357. 2 J. J. Marsh. R. 139. 3 Mon. 187.

4. The statements of James M. Wright were admissible—he was a necessary party. He is charged as a fraudulent conspirator, and so may be required to discover it; again, he denies title passing to Cornelius by Sheriff's sale, alleging the property to be that of George—the complainant had a right to discovery of the facts relative to the title.

McBRIDE, J., *delivered the opinion of the Court.*

The appellee, Cornelius, in November, 1842, instituted a suit on the Chancery side of the Boone Circuit Court, against the appellants, who are the heirs and legal representatives of George M. Wright, deceased, who died intestate, in the month of September, 1840, without descendants.

The bill charges that James M. Wright, a brother of the deceased, in the month of November, 1838 or 1839, purchased with his *own money,* at the Land Office at Fayette, Mo., one hundred and fifty-one and fifty hundredths of acres of land, being part of the north-east quarter of Section No. 22, of Township No. 46, in Range No. 13, west, situate in Boone County: that at the time, the said James was involved in debt, and in order to shield and protect the land from the payment of his liabilities, and to secure a home for himself and family, he resorted to the expedient of taking the certificate of entry, in the name of his brother George, then living, and that George died possessed thereof. That Peter Wright, another brother, has administered on the estate of the deceased.

That James M. Wright being indebted to Cornelius, confessed a judgment at law in his favor, for about $2200, in November, 1840—that execution issued thereon, which was levied upon the land above described, and the same having been sold by the Sheriff, was purchased by said Cornelius, who, on the 6th of May, 1841, obtained a deed therefor.

The bill further charges, that George, the deceased, in his life-time permitted James and his family, soon after the entry of the land, to take possession and to occupy and enjoy the same, from that period down to the present time; that said heirs and legal representatives to whom the title at law descended, upon the death of said George, well knew that the said land was entered with the money of the said James, and *not* with the money of the said decedant, and that the title in equity was in said James, and the land subject to the payment of his debts, yet, they refuse to surrender the title to the complainant, who by virtue of his purchase at Sheriff's sale, has succeeded to the rights of said James. The bill prays that the defendants may be compelled to convey and surrender up to the complainant, all their interest in said land, and for general relief.

James M. Wright, in his answer admits that the complainant obtained judgment against him as charged in the bill, but states that he has no

knowledge of the sueing out of execution, or the levy thereof on the land in controversy, nor the sale, purchase and deed of and to the said land—that when said judgment was rendered, he did not own, claim, or pretend to claim, any portion of said land, otherwise than as tenant under his brother George, and since his brother's death, only as one of his heirs and legal representatives, of one-twelfth part thereof. That in the latter part of the year 1838, George entered the land, at the Fayette land office, in his own name, with his own money, and for his own benefit, and took the receiver's certificate therefor; that he did not furnish any money whatever to George, for the purpose of entering the land, nor did he by any persuasion, means or contrivance, procure George to enter the same for respondent's use or benefit—that neither directly nor indirectly did he give or furnish, or procure to be given or furnished, any money, property or means whatever, to enable, or induce his brother, to enter the land, nor has he since the entry, and before the death of said George, given or paid him any consideration for said entry or land, nor was there ever, at any time, any contract or contrivance whatsoever between them in reference thereto, by which the land was to be exempted from the payment of his debts, or any creditor delayed, hindered, or defrauded thereby.

He further answers and states that in 1837 or 1838, owing to misfortune in trade, he became embarrassed, and gave up every species of property, in liquidation of his debts, and that when George M. Wright entered the land in controversy, this respondent was destitute of a home, and out of employment, and proffered to let him take possession and improve the same, which he did until the death of George, without any specific contract as to his compensation. That George did a few weeks before his death, tell him that he intended to give the land to respondent's children, but that his intentions were never carried into effect.

The answer further states, that on divers occasions the respondent claimed the land as his own, alleging that he had an equitable title to the same, that he did so, not because he, in fact, had any such title, but because he supposed it would or might influence his brothers and sisters to convey and relinquish their title to said land, to him, thereby carrying out what he verily believes was the intention of his brother, to give the land to the children. That he was further induced to set up a claim to the land, hoping that the complainant would endeavor to subject it to the payment of his judgment against this respondent, when he could set up as a defence or bar to the complainant's right thereto, the fraud perpetrated by said complainant on this respondent, in obtaining the bonds

upon which the judgment at law was had, and which he was ignorant of at the time of the judgment. But that he is now advised that his defence cannot be made in this cause.

Peter Wright, and most of the other defendants, answered the bill, denying all knowledge of the material allegations contained therein, and requiring proof thereof. Other of the defendants failing to answer, the bill was taken as confessed against them.

Replications having been filed to the answers, the cause was set for hearing at the August Term, 1845, of the Circuit Court of Boone County, when the Court rendered a decree for the complainant, according to the prayer of his bill. Thereupon the defendants filed their motion for a re-hearing of the cause, assigning the following reasons:— 1st. Because the Court permitted the plaintiff to give in evidence, incompetent and irrelevant testimony, upon the hearing of the cause. 2nd. Because the Court permitted the complainant upon the hearing of the cause, to give in evidence, the declarations of James M. Wright, with reference to the entering and purchasing of the land in controversy, and the declaration of said James that the land was purchased at the land office, with the money of said James. 3rd. Because said declarations were made (and received as evidence by the Court upon the hearing,) in the absence of the said George M. Wright, and also in the absence of the defendants in this cause, who are heirs of said George, deceased. 4th. Because the finding of the facts of the cause, as well as the decree of the Court, are against the law and the evidence given in the cause. 5th. Because the same is against equity and good conscience. Which being overruled, the defendants appealed to this Court.

The bill of exceptions shows that upon the hearing of the cause, in the Court below, the complainant gave in evidence the proceedings in the cause at law, between himself and James M. Wright, the judgment and execution thereon, and the Sheriff's deed to said complainant for the land in controversy. He further offered in evidence a letter from James M. Wright to James Gordon, which was objected to by the defendants, but their objection having been overruled, and the hand writing proved, the same was read, as follows :—

"*Missouri, Boone County.*

"I left with Hampton L. Boon, 150 dollars, if I mistake not, of my money to enter the land I now live on—told him it was George M. Wright's money, and to have the land entered in his name. I returned home from the Land Office without having the land entered, as this was not enough money to enter the land. I went to my mother, who had the

care of George M. Wright's money—told her to let me have $48 of his money, for I had not enough of my own to enter the land,—she gave it to me, and I left my due bill in the mouth of his purse (or money bag,) for the same. I gave the $48 to Elijah Wright's son William, and an order in the name of George M. Wright for the $150 I left with H. L. Boon, and pulled corn in his place, at his father's, while he went and entered the land. I told him the money was George's;—Elijah Wright saw me give William (his son,) the money and order. Elijah smiled and said he expected I would do better than William, (my brother,) who had gone to Spring river, fully understanding the money was mine, but did not ask if it were—but would not let his son go, until I would pull corn in his place, and also charged his son to tell no person his business on the way. William drew the money from Boon, and had the land entered in the name of G. M. Wright, but made a mistake in the duplicate. I wrote to Boon about it, and signed my name agent for G. M. Wright—he wrote to me it had been entered on the books, in the name of G. M. W. (see the letter at Wm. Cornelius's.) During this time, George was in the woods surveying, and knew nothing of the transaction. When he came home, I told him what I had done, that I had entered the land in his name, and told him I was a going to enter it in the name of brother Peter, who had told me I might do so, but that if James K. Wright should ever want the land, I must take pay for my improvements and let him have it;—this appeared to excite George, and he said let it stand just as it is, and I will keep it for you, I care nothing about the $48, I will give you that, and accordingly I have never seen the due bill. I named to brother Peter, he was in a narrow place with his son-in-law, J. K. Wright, who at that time wanted the land, and that it had been entered in another name. I thought he was not pleased about it, (for I did not tell him I would not enter it in his name,) and he replied, 'hush! say as little as possible about that matter.' I wanted George to let Cornelius have the land, and to pass a deed to him for the same; he said he would if Cornelius would release me from debt—he told me he would do that—so George said he would pass the deed—we conversed with Cornelius about it, he came and seen the land, and told George and myself he would do it, if Peter Wright would relinquish his interest in the 45 acre tract, which I lived on near my father's, and which interest he had purchased of father—he would not do this, so the trade spoiled. I wanted George then to convey all the interest he had in the land to my children, as I now had lost all hopes of paying my debts with it—he said he would do it, but put it off—once told me he was afraid of

criminating himself to pass any title—he told Peter Wright's family he intended my children to have the land, (subpœna Peter and William E. Wright.) George told Fletcher Wright he should have the land on the hill next to him, and this was understood when Cornelius came to see it, that if he got the land, he should let Fletcher have that portion. I have no doubt but George told Peter all about it—he told Fletcher how it was, and that he would not claim it—he always retained the duplicate—told Fletcher I had entered the land with his money, and that I had as well thrown it in the fire. John E. Teeters heard George and Fletcher have a conversation on this subject—(subpœna him)—he will not say what George said *except* that he said I must have a home. George told James K. Wright what disposition he wanted made with his property while on his death-bed—said he wanted my children to enjoy his property, and that he did not want Cornelius to enjoy it. I have no doubt but he told Kelly the condition of the land —he told no person in the world how he wanted his property divided but Kelly, (subpœna him,) Elijah Wright, William Wright, (his son,) Peter Wright, William E. Wright, (his son,) Fletcher Wright, John E. Teeters, H. L. Boon; if you want my mother's evidence, you must get that at her house, she is too frail to go to Court. I give you these particulars so you may judge the better of the case. The land is mine— my money entered it, and the world cannot prove to the contrary. When I thought of entering the land in Peter's name, I sealed up the $150 in paper, my wife gave it to Myra J. Wright, J. K. Wright's wife, she gave it to her father, P. W., and the next morning I called for the money, Peter gave it to me without breaking the seal, told me to enter him as much land as that would buy. If you desire any other particulars, communicate to me by mail, and I will give you all I know.

"Yours, very respectfully,

"JAMES M. WRIGHT.

"*James Gordon.*"

James M. Gordon, testified, that about the — day of —— 1840, James M. Wright and William Cornelius came to his office together, in the town of Columbia, and that at that time, James M. Wright told him the same facts in substance of the letter of James M. Wright above recited. That afterwards, James M. Wright, when he came to confess a judgment in favor of William Cornelius, in the Boone Circuit Court, told him the same facts substantially—that after this, James M. Wright went home and wrote him this letter, which he a few days after received—that Jas.

M. Wright frequently talked the matter over with him afterwards, and told him in substance, the facts set forth in his letter above recited.

John E. Teeter, testified, that he heard a conversation between George M. Wright and Fletcher Wright, his brother, at the house of the latter, a short time before James moved upon the land in controversy, in which conversation Fletcher said, why don't James come down here into the rich land, and take a lease upon some land? George replied it was an up-hill business for one hand to get along in this bottom by himself. When this was said they were talking about James's distresses—George said James had money enough to enter him a piece of land, and that it was not worth while for him to enter it in his own name, for his creditors will take it from him—some of us ought to take his money and enter him a home. Fletcher said he would smuggle property for no man, and that when he died he wanted his mind free of every thing, and that all he had should be his own. George then turned to witness and asked him how the lines run of the land adjoining Fletcher's, and afterwards entered. Witness said he agreed to go next morning and show them—that next morning, George, Fletcher and witness, went upon the land, and while there, they examined for a spring, which was supposed to be upon the land, but upon examination they found it not to be upon the land. That while upon the land, George said, I will enter the land, I think James can support a small family on it—that as they were going home, Fletcher remarked that one line of this tract run near his house, and if George did enter it, he wanted him to sell him a small strip of it. George said, if I enter it, you and James for that, for I have nothing to do with it—that he heard Fletcher Wright say, talking upon the subject of the entry of the land by George M. Wright for James M. to live on, that they might all smuggle as much as they pleased, he wanted to live clear—that James M. Wright moved upon the land some time after this conversation—that after James moved upon the land, witness met George in Columbia, and George asked him how James was doing, was he at work? Witness told him James was doing well—George asked him then if James had sold Fletcher a piece of the land, witness answered him that he did not know. Witness lived at James M. Wright's some time after he moved on the land, and he frequently heard him talk about the land, and James told him, witness, that the land was entered with his (James's) money, with the exception of $48, and that sum he had gotten from George, and that George had said he did not want it, if his (James's) children could get it. George never told witness that he had any money in his possession

belonging to James; but that James, after he moved upon the place, (the time he does not recollect,) told witness that George had some of his money, the proceeds of a sale of peltry and furs, brought by James from Santa Fe—that he had about $1000 worth, that he heard his creditors were dissatisfied about not getting it, and he shipped it off and sold it, and that a portion of this money was in George's hands, and part of it had paid for the land.

Cross examined—Witness stated that James M. Wright, two years ago, made out an account against the estate of George M. Wright, and presented the same for allowance, before the Boone County Court, for the improvements made upon the place, and that he was used as a witness by James M. Wright to prove the account, and that upon that occasion, he stated that George told him that he would enter the land, and that George told him he had entered the land, and that afterwards James went upon the land and made the improvement, for which he then claimed pay, and that he further stated at that time, he did not know who owned the land; but would then have stated what he now states if he had not been stopped by counsel—and further stated that James never told him positively, that the land was entered with his money, and also that James and George had never together had any conversation in the presence of the witness.

Milton S. Matthews, testified, that he was present at a trial of James M. Wright, before the church at Mount Moriah, when he stated the facts about the entry of this land, by George M. Wright, in the manner substantially as is stated in the letter of said Wright, which he has heard read to the jury—that $150 of the money which went to pay for the land, was his (James's) money, and that $48 was taken by him out of the purse of George, which was in their mother's possession, and that he placed his note for the money in the purse when he took it—he also said he had received the money for the furs, and that when he had formerly stated on trial, in the church, he had never received that money, he had lied—and he stated that he had retained a part of that money, and entered the land with it, and if George had have lived, there would have been no difficulty about the land.

James K. Wright, testified, that at the time the entry was made, he was not in the State, and knew nothing of it—that in August, 1840, which was shortly before George died, he had a conversation with George M. Wright—that he had formed a partnership with George for the purpose of selling goods, and that in the conversation George asked witness if he knew the particulars about his entry of the land,

referring to the land James lived on, witness told him he presumed he did—George told him that the letter W. had been placed in his name, in the certificate of entry, instead of M.—that James had attended to it in his absence, and that he feared there was some design in it—that William M. Wright, his nephew, had gone up and entered it, and knew his name as well as he knew it himself, and asked witness's opinion about it,—witness told George he did not think that would prejudice his right in the least—George then said he would never make James a deed until he got his money back—said that George intimated in the conversation that James had put the W. in the certificate of the receiver to defeat George's title—stated also that witness and George had had it in contemplation to purchase this tract some time before the entry was made, provided they could get a piece adjoining it, but that they did not get the piece they wished, and abandoned the idea of buying this—that when George said he never would make James a deed until he got his money back, remarked he might give it to James's children—that James M. Wright moved upon the land spoken of, as entered in George's name, a short time after the entry was made, and has lived on it with his family ever since, up to this time.

Elijah Wright, testified, that in the fall of 1838, while he was pulling corn, James came to him and said he wished a favor of him, that George was about to enter a piece of land, and had deposited a part of the money in the office at Fayette, Mo., for that purpose, and had gone into the woods to survey public lands; that he (James) had understood that the piece was a fractional quarter, and that part could not be entered; that he had been to see his mother, who had George's key, and that she had consented to let him have the balance of the money to enter the whole piece for George—that there was a cabin on the land, and that he was somewhat interested in getting the land, because George had told him he might go upon the land and live—that his family was sick, and he could not go to Fayette and attend to making the entry, and asked the favor of witness to let his son William go and enter it. Witness told James if he would pull corn while William was gone, he might go; to this he consented, and William went to Fayette. Witness resisted the claim of James in the County Court against George's estate, because he thought it exorbitant and unjust, and thought that the use of the land had been sufficient compensation for his improvement. After he consented that his son might go to Fayette to enter the land, James went over to the old lady Wright's place—came back with money, gave it to his son William, and he went—his son Wil-

liam is now dead. At this time, George was absent from home,—had been absent for two or three weeks on a surveying tour.

Cross examined:—About two years after George's death, James brought him a deed to sign; the deed purported to convey the land from the heirs of George to James; this, witness refused to do; James then asked witness if he would convey the land to his (James') children; this he refused to do; James then told him that the heirs of George should never have any benefit of the land, for the land was entered with his money, except $40; this was the first time witness ever knew that James set up any claim to the land; witness does not know of George having any lands in the vicinity of the land spoken of, and never heard George say any thing about what he had done for James; that afterwards, in Columbia, James told witness that the land was entered with his money, except $48, and that the heirs had better convey the land to him or his children, for neither the heirs, nor Moses U. Payne, should ever have any benefit from it; that he had given it to George, and that George had never re-conveyed it to him; stated that George lived two years after the entry, and that when he died, he was one of the administrators, and never found in his papers any note on James M. Wright; he does not know of George's ever having in his hands any money belonging to James, nor did he ever hear George speak a word about entering the land; that George, the summer previous to the entry, was county surveyor, (deputy,) and had a map of the vacant lands lying on the river, on both sides; never saw any letter or any writing from George or James concerning the entry, to himself or to any other person.

John E. Teeter, recalled, testified, that the conversation spoken of in his examination in chief, occurred about two years previous to the death of George, and does not recollect the season of the year in which it occurred; and that he knew the lines bounding the land, not from any regular survey, but from having been with Nash when he made an irregular survey of land adjoining this.

A. W. Turner, for the defendants, testified that he was present at the trial of James M. Wright, against the estate of George M. Wright, in the Boone county Court, and was counsel against James M. Wright, and that John E. Teeter was the witness to prove James' account; and that Teeter, on that trial, stated that George M. Wright told him, (Teeter,) before he entered the land, that he was going to enter it, and after George M. Wright entered the land, he asked Teeter if James M. Wright was at work on the land, and then said, he, Geo. M. Wright, had entered the land; this was what Teeter stated in substance.

Two points are made by the appellants in this Court, and relied upon to reverse the decree of the Circuit Court.

1st. That the Court permitted the complainant to give to the Court incompetent and irrelevant testimony.

2d. The Court rendered the decree in the cause against law and evidence.

To sustain the action of the Circuit Court, in permitting the complainant to give in evidence the oral and written statements of James M. Wright, it is insisted that he was a necessary party, and being charged in the bill as a fraudulent conspirator, should be required to discover it.

If the charge in the bill be true, that complainant obtained a judgment against James M. Wright; that execution issued thereon, and that whatever interest James had, in and to the land in controversy, was sold by the sheriff, and purchased by the complainant; then the complainant succeeded to all of James's interest and stands in his place fully invested in law and in equity with all his right and title—we cannot perceive the necessity of making him a party to the bill. .

Courts of equity adopt two leading principles for determining the proper parties to a suit. One of them is a principle, admitted in all Courts upon questions affecting the suitor's person and liberty, as well as his property, namely, that the rights of no man shall be finally decided in a Court of justice, unless he himself is present, or at least unless he has had a full opportunity to appear and vindicate his rights. The other is, that when a decision is made upon any particular subject matter, the rights of all persons whose interests are immediately connected with that decision, and affected by it, shall be provided for, as far as they reasonably may be. It is the constant aim of Courts of equity to do complete justice, by deciding upon and settling the rights of all persons interested in the subject matter of the suit, so that the performance of the decree of the Court may be perfectly safe to those who are compelled to obey it, and also that future litigation may be prevented. Courts of equity delight to do justice, and not by halves. Hence it is a *general* rule in equity, that all persons materially interested, either legally or beneficially, in the subject matter of a suit, are to be made parties to it, either as plaintiffs or as defendants, however numerous they may be, so that there may be a complete decree, which shall bind them all. Story's Equity Pl.; Cooper's Eq. Pl.; Mitford's Eq. Pl.

But it is contended that although James M. Wright may not have such an interest in the subject matter as to make it necessary, under the *general rule,* to make him a party defendant, yet he comes fully within one

of the exceptions to such rule; for the bill charges him with being a fraudulent conspirator with the other defendants. There is a marked distinction, however, between a charge in a bill of conspiracy and combination, and the proof necessary to sustain such charge. To assume the fact, from the charge in the bill, would entirely dispense with all proof on the subject; whereas, the more equitable rule is, that the charge should be established *aliunde,* and then, and not till then, is the complainant permitted to give in evidence the declarations of one defendant to affect the rights of a co-defendant—as in the case of partners in the same transaction, or where one defendant succeeds to another, so that the right of one devolves on the other, and they become privies in estate.

This course was not pursued by the Court below in the case now under consideration. That Court assuming or taking for granted, from the charges in the bill, that a combination existed, permitted the complainant to introduce as evidence, and against the other defendants, the written and verbal statements of James M. Wright; and made them the foundation for a decree in favor of the complainant in the cause; and that, too, notwithstanding the allegation in the bill, that the complainant had, by virtue of the sheriff's sale and deed, succeeded to and represented all the rights of James M. Wright.

James M. Wright having been divested of all interest in the land in controversy, should not, we think, have been made a party defendant; but having been so made, after the coming in of his answer, wherein he declaims all interest—if his evidence was material to the rights of the complainant, an order should have been obtained from the Court for permission to use him as a witness. This was not done. If he was a competent witness, it was clearly against the rules of evidence to prove by other testimony his knowledge of the transaction. Such evidence would only be hearsay, and without any necessity known to the law for its introduction.

If the defendants here claimed title under James M. Wright, either directly or otherwise, then it might be proper to introduce the declarations of James, made prior to or at the time when he parted with his title; but they do not so claim; their title is under George, their deceased brother, and adverse to that of James.

If the principle be established that an individual, in failing circumstances, and between whom and others having property, no privity exists, can create by his own declarations an estate to satisfy the demands of his creditors, then there will be no safety in our titles.

But it is said by the complainant's solicitors, "that the facts charged in

the bill, are not alleged to be within the knowledge of any of the defend-
ants except James M. Wright, and the evidence of one witness, or facts
and circumstances equivalent to the evidence of one witness, is sufficient
to sustain the decree against the answers of the defendants," and for
this principle we are referred to 4 Bibb R. 357, 2 J. J. Mars. R. 139, and
3 Mon. R. 187.　But those authorities do not sustain such a principle;
they only assert what is rational, that is, "that one witness without any
corroborating circumstances, is sufficient to sustain a bill of injunction
against an answer, in which the defendants profess that they know noth-
ing about the subject, or where the facts may not be within the defendant's
knowledge."　The true rule, we apprehend, is that the answer of a
defendant, when responsive to the bill, must be taken to be true, unless
it is contradicted by the positive testimony of two witnesses, or the tes-
timony of one witness with strong corroborating circumstances.　2 John.
Ch. Rep. 92; 6 Wheat. 468; 1st Bibb 235.　And this is the rule of reason
as well as of equity, for the answer being under oath, it is equivalent to
the evidence of one witness, which would only be set off by the positive
evidence of a witness in the cause, contradicting the answer, and then to
outweigh and disprove the answer, it would require the evidence of
another witness or strong corroborating circumstances.

Very different is the case now before us, where the facts charged are
not only supposed to be within the knowledge of James M. Wright, and
so charged in the bill, but are expressly denied by the answer.　Suppose,
however, that the evidence of one witness is sufficient to discredit the
statements of James M. Wright, made in his answer, what avail would it
be to the complainant?　A decree against the other defendants would
not go as a legal consequence, but he would be required to prove the
truth of the charges and allegations in his bill.

Again, if it were conceded that the verbal and written declarations of
James, under the circumstances, could be received as evidence, to divest
the other defendants of title, and invest himself with such an estate as
would enable him to pay his debts, the question would arise whether his
declarations are entitled to credit.

It is not necessary to canvass them further than to refer to and compare
his written and oral statements, as proven by his letter to Mr. Gorden,
his declarations made to him, and upon his trial before the church, with
those made in his answer under oath, to show his prevarication and
inconsistency, and the falsehood of the one or the other.

We cannot consent that the declarations of a man, who has shown such
an utter disregard for his own reputation, as also for the rights of his co-

defendants, shall be made the basis of a decree whereby the rights of any individual are to be affected. At most, his verbal declarations only impeach his answer, whilst his answer fully disproves his verbal and written statements, leaving it uncertain whether the one or the other, or either, be true, and rendering it immaterial to enquire which are most entitled to credence. He has wantonly, and by his own voluntary act, destroyed his own credibility.

Independent of the statements of James M. Wright, which ought not to have entered into the consideration of the Court in making the decree, we will examine and see whether the decree be warranted by the testimony in the cause. The first in the order of time is that of John E. Teeter, who states that he was present when George, the deceased, and Fletcher, one of the brothers, were examining the land in controversy, prior to the entry by George, when George said that James had money enough to enter him a piece of land, but that it was not worth while for him to enter it in his own name, as his creditors would take it from him, and that some of his friends ought to take his money and enter him a home. To this suggestion Fletcher replied that he would smuggle property for no man, and that when he died, he wanted his mind free of every thing, and that all he had should be his own. George then turned to Teeter, and enquired how the lines of the land adjoining Fletcher's, and afterwards entered by him, run. The next morning the parties again went upon the land, and whilst there George said he would enter the land, as he thought James could support a small family upon it. As they were returning home Fletcher remarked that one of the lines run near his house, and if George did enter the land, he wanted him to sell him (Fletcher) a small strip of it; George said if he entered the land, Fletcher and James for that, for I (George) have nothing to do with it. James moved upon the land some time after this conversation, and thereafter Teeter met George in Columbia, when the latter enquired how James was doing, whether he was at work, and if he had sold Fletcher any of the land. After the death of George, James presented an account against the estate, for allowance for improvements made by him on the land, and Teeter was the witness by whom he established the same.

George asked James K. Wright if he knew the particulars about his entry of the land, referring to the land on which James M. Wright lived; George said that the letter W had been put in his name in the certificate of entry, instead of M; that James M. had attended to it in his absence, and that he (George) feared there was some design in it; that his nephew William M. Wright, had gone up and entered it, and knew his name as

well as he knew it himself, and asked the witness's opinion about it.   He told George that he thought it would not prejudice his right in the least; George then said he never would make James a deed, until he got his money back, and intimated that James had had the W put in the certificate of entry to defeat his title; remarking, further, that he might give it to James's children.

It was disclosed by the evidence that James M. Wright was greatly embarrassed and had a family, whilst George M. Wright, deceased, was unmarried, unembarrassed, and had means.

Divesting the case, then, of the suspicion of a fraudulent combination, thrown around it by the reprehensible conduct of James M. Wright, and the improper admission as evidence of his diverse statements, it would appear that George M. Wright, deceased, who was the brother of James, was desirous of rendering him that service or aid which James's embarrassed condition appeared to require, to enable him to support his family. He suggests to another brother, Fletcher, that some one of the family should take James's money, and enter him a piece of land in their name; whereby it would be protected from liability for James's debts, and at the same time afford him a home, and the means of a support for his family.   This proposition was disapproved of by Fletcher, and it is but fair to presume that it was abandoned, either from the suggestion made by Fletcher, that it would be smuggling, or because George was mistaken when he stated that James had money enough of his own to enter the land.   For the testimony of James K. Wright shows that the land was entered with the money of George, and that George was apprehensive that his brother James, in making the entry for him, had not acted in good faith.   George then declares that he never will convey to James until his money is refunded, but that he might perhaps give the land to James's children.

But when Fletcher enquired of George, whether if he, George, entered the land, he would sell him, Fletcher, a strip off of it adjoining him, George replied, that if he entered, Fletcher and James for it, as he, George, would have nothing to do with it, may, I think, be readily explained by reference to the relation existing between the parties, and the fact that as George designed to enter the land for the benefit of James, and ultimately as a gift to his children, he did not desire to interfere himself with it, but would leave the brothers, who were more directly interested, to make such an arrangement as best suited them.   Teeter, who heard the conversation, could not have believed that the land was entered with the money of James, for he was the witness by whom James

established, in the County Court of Boone county, a demand against the estate of George, for the improvements made by him on the land in controversy. If he did believe so, and suffered himself to be used as a witness to establish a false demand against the estate of a dead man, no credence should be given to his testimony.

The decree of the Circuit Court ought to be reversed, and the bill dismissed, and the other Judges concurring, the decree is reversed, and the bill of the complainant dismissed.

Scott, J.

Whether James M. Wright was a proper party to the bill or not, his answer was only evidence against himself; he could not have been examined as a witness against the other defendants, for he was interested. 8 Mo. Rep., King vs. Bailey, and the [cases there cited. I am in favor of reversing the decree.